# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs August 18, 2010

## BOBBY REED ALDRIDGE v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Lawrence County**
**No. 26821      Robert L. Jones, Judge**

---

**No. M2009-01763-CCA-R3-PC - Filed September 15, 2010**

---

Pursuant to a plea agreement, the Petitioner, Bobby Reed Aldridge, pled guilty to one count of attempted second degree murder and one count of theft over $1000, and the trial court sentenced him to fourteen years in the Department of Correction, to be served consecutively to a three-year sentence the Defendant received in a collateral proceeding for violating his probation. The Petitioner filed a petition for post-conviction relief, claiming that he received the ineffective assistance of counsel. The post-conviction court denied relief after a hearing, and the Petitioner now appeals. After a thorough review of the record and applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which DAVID H. WELLES and NORMA MCGEE OGLE, JJ., joined.

M. Wallace Coleman, Jr., Lawrenceburg, Tennessee, for the Appellant, Bobby Reed Aldridge.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Clark B. Thornton, Assistant Attorney General; Michael Bottoms, District Attorney General, for the Appellee, State of Tennessee.

## OPINION
### I. Facts
#### A. Guilty Plea

This case arises from a domestic dispute. The presentence report in the record summarizes the dispute as follows:

The Defendant tied the hands and feet of [the victim] during a domestic disturbance and then began hitting her with a .22 caliber rifle. In the process he broke the rifle which belonged to [the victim]. Afterward he stole a Chevrolet S-10 pickup truck belonging to [the victim] and fled the scene. [The victim] was treated for serious bodily injury as a result of this attack.

A Lawrence County grand jury indicted the Petitioner for attempted first degree murder, aggravated kidnapping, theft of property over $1000, and vandalism under $500. At the time of this offense, the Petitioner was serving a probated sentence for a previous arson conviction, and a violation of probation warrant was issued upon his arrest for the current charges.

Pursuant to a plea agreement, the Petitioner pled guilty to one count of attempted second degree murder, a Class B felony, and one count of theft of property over $1000, a Class D felony, and the aggravated kidnapping charge and vandalism charge were dismissed. The Defendant also agreed to a full revocation of the three-year probated sentence he received for arson. The trial court sentenced the Petitioner to an effective sentence of fourteen years in the Tennessee Department of Correction for the charges in this case, and ordered the Defendant to serve this sentence consecutively to the three-year probation revocation sentence.

During the plea hearing, the Petitioner testified that he was in good physical and mental health and was not taking medications or under the influence of any substance that might impair his ability to understand the plea. The trial court reviewed the Petitioner's charges and the possible punishment for each charge. The trial court then reviewed the terms of the plea agreement with the Petitioner. The Petitioner confirmed that he agreed to serve a two-year sentence for the theft charge and a twelve-year sentence for the attempted murder charge and that he agreed to serve the two sentences consecutively. The Petitioner further agreed that, by committing the crimes in this case, he had violated the terms of his three-year probated sentence for arson and that the fourteen- year sentence for his new charges would run consecutively to the reinstated three-year sentence, for a total effective sentence of seventeen years.

The trial court listed and explained the Petitioner's rights and asked the Petitioner whether he understood his rights and whether the Petitioner wanted to waive those rights and enter the plea agreement with the State. The Petitioner responded that he understood his rights and wanted to enter the plea agreement. The Petitioner testified that no promises had been made, other than the agreement with the State, or threats made against him in order to convince the Petitioner to give up his rights to a jury trial and plead guilty. The Petitioner further testified that he was "freely and voluntarily" entering the plea agreement. The Petitioner declined the opportunity to further consult privately with his attorney about his plea

and said he had no questions for the trial court. The trial court concluded with the following findings:

> The Court finds that this defendant has knowingly, freely and voluntarily waived his right to trial by jury and his right to a revocation hearing, and that he has entered a plea of guilty to these new offenses: Attempted second degree murder and D felony theft.

## B. Post-Conviction Hearing

The Petitioner filed a petition for post-conviction relief claiming that he received the ineffective assistance of counsel. The Petitioner raised other issues in his petition, but, because he does not maintain those claims on appeal, we address only the ineffective assistance of counsel claim. The post-conviction court held an evidentiary hearing wherein the following evidence was introduced:

The Petitioner testified that the victim stole a winning lottery ticket from him, cashed it, and deposited the proceeds in her checking account. An argument ensued between the Petitioner and the victim at the victim's house, and the victim displayed a gun and told the Petitioner to leave. The argument escalated to a physical altercation after the victim displayed the gun. The Petitioner said that based upon the fact that the victim first drew a weapon, he would have presented a self-defense argument to the jury. The Petitioner said there might have been other witnesses to testify that the victim had pulled a gun on those witnesses on other occasions, but there were no witnesses to their altercation.

The Petitioner recalled that the victim's aunt arrived at the victim's house "as soon as it was over with" while the Petitioner was trying to carry the victim to the truck to take her to the hospital. The Petitioner testified that he was living with the victim at the time and that she had twice before pulled a weapon on the Petitioner while using "pills."

The Petitioner testified that two public defenders worked on his case ("Counsel" and "Co-counsel"). The Petitioner testified that he was coerced into taking the plea because Counsel conveyed to the Petitioner that the District Attorney said the victim was going to have surgery and could die. If the victim died, the Petitioner was told the State would seek a first-degree murder conviction. Counsel advised the Petitioner that the penalty for first-degree murder was fifty-one years, a life sentence. Based upon this information, the Petitioner agreed to plead guilty. After pleading guilty, however, he learned that the victim never had the surgery. Thus, the Petitioner contended, he was coerced into accepting the plea based upon a false statement from the District Attorney's office.

The Petitioner testified that the victim was present at the preliminary hearing for the charges. He described her as being "fine" until she took the witness stand, when she "acted like she was having a seizure" and was carried into the hallway. The Petitioner said he was then escorted out into the hallway, where he saw the victim, who appeared to the Defendant to be "fine." The Petitioner recalled that the victim had a noticeable injury with stitches to her head.

The Petitioner testified that he had a stab wound on his leg that would have supported his theory of self-defense. He said that he spoke with his attorneys about a self-defense strategy, but he complained that "no one ever pushed it." The Petitioner said that he was never shown discovery materials for his case. The Petitioner also never saw any evidence that linked him to the victim's stolen vehicle, which formed the basis for the theft charge. The Petitioner was told the truck was found in Wayne County while the Petitioner stated he was in Florence, Alabama.

The Petitioner testified that he only saw Counsel during court appearances. The Petitioner recalled that, several weeks after he signed the plea agreement with Counsel, he returned to court for the plea hearing. At the hearing, Co-counsel was present instead of Counsel. The Petitioner said that, due to his limited access to Counsel, he was unable to make a good decision regarding his case. The Petitioner said that Counsel and Co-Counsel "led [him] on" by telling the Petitioner that the victim was going to die which scared him. The Petitioner said he was first able to tell Counsel or Co-Counsel his version of the events underlying this case the day of the plea hearing. Even though this was the first time he was able to discuss his side of the case with an attorney, he proceeded with the plea agreement because Co-counsel advised it was "the best thing to do." The Petitioner testified that Counsel never discussed with him his rights.

On cross-examination, the Petitioner admitted that he had eighteen previous convictions and that he had entered plea agreements in the past. The Petitioner acknowledged that the trial court asked him questions prior to his plea and that he answered those questions truthfully. The Petitioner explained that, at the time of the plea, he wanted to enter the plea based upon the message from the District Attorney that the victim was going to have surgery and that, if she died, the State would pursue a first-degree murder charge. It was not until several weeks later that he realized the victim did not have surgery, and, therefore, the information Counsel and Co-Counsel conveyed to him was false.

Co-Counsel testified that she first met the Petitioner in General Sessions Court to represent him during the preliminary hearing. Co-Counsel recalled that she interviewed the Petitioner before the hearing. Co-counsel said she did not agree with the Petitioner's description of the victim at the preliminary hearing as "fine." She recalled that "[the victim]

-4-

looked terrible. She limped onto the . . . podium; she was drooling because of . . . whatever injuries she had suffered. She testified that her hands were crushed. She testified about brain injury." Co-counsel cross-examined the victim and was pursuing the Petitioner's line of questioning for self-defense. At some point during the hearing, the victim had a seizure and was removed from the courtroom. The seizure did not appear like an act to Co-counsel, and the Petitioner advised Co-counsel that they could stop the preliminary hearing due to the victim's seizures. The case was "bound over" as an aggravated assault. Co-counsel testified that, based upon the victim's injuries and testimony, she believed pleading guilty to aggravated assault was in the Petitioner's best interest. It was at this point that Counsel took over the case and handled the negotiations with the State.

On the day of the plea hearing, Counsel was unavailable, so Co-Counsel appeared in his place. Co-counsel spoke with the State's attorney, who, according to Co-counsel, did not mention anything about the victim having surgery. Co-counsel testified that all the State's attorney said about the victim was that the victim wanted the Petitioner to plead to a sentence including two additional years. Co-counsel said she discussed the change with the Petitioner and told him that he did not need to enter a plea on that day and that he could wait to consult with Counsel, but the Petitioner wanted to "get it over with" and proceed with the plea. Co-counsel said that, although it would be true, she never told the Petitioner that, if the victim died, he would be charged with first-degree murder. Co-counsel said that she reviewed the plea agreement with the Petitioner on the day of the plea hearing, even though Counsel had previously done so, and she signed the plea agreement.

On cross examination, Co-counsel said that the Petitioner's client file contained a discovery motion but no discovery material.

Counsel testified, first confirming that Co-counsel conducted the preliminary hearing in this matter. After the hearing, Co-counsel told Counsel that, due to the nature and extent of the victim's injuries, she was concerned the State might indict the Petitioner for an enhanced charge. Counsel attempted to negotiate a plea on criminal information to avoid this possibility. Counsel said that the grand jury returned an indictment for attempted first degree murder rather than the original aggravated assault before they were able to make an agreement with the State as to a criminal information.

Counsel testified that he reviewed the plea agreement with the Petitioner in January, several weeks before the plea hearing and that the Petitioner appeared to understand the plea agreement and its implications.

Counsel testified that he did not recall and found no documentation of mentioning to the Petitioner that, if the victim died, the State would pursue a first-degree murder conviction.

Counsel said, however, that if the State's attorney made that statement, he would have conveyed it to the Petitioner. Counsel testified that he met with the Defendant "two, three, maybe even four times." Counsel said that he did not receive any discovery in this case from the State. He explained the absence of discovery was due to the case strategy, which was to rush the negotiation to avoid an enhanced charge from the grand jury.

Counsel testified that he discussed a self-defense argument with the Petitioner. He said that the Petitioner's statement that the victim came after the Petitioner with a rifle was consistent in all of their discussions. Counsel said that he explained to the Petitioner that self-defense was a jury question and that self-defense would be difficult to prove in this case based upon the extent of the victim's injuries. Counsel said that a jury might have used the degree of the victim's injuries as evidence that the force used for self-defense was excessive.

Asked whether Counsel believed the plea agreement was reasonable, Counsel responded:

> I don't make those decisions. I present the offers to our client. It's up to them whether they want to accept it or reject it. I will attempt to answer any questions that they may have concerning the offer, the effects of the offer. If I'm ever asked whether I think it's a good offer, I won't answer that.

Counsel did not recall discussing the penalty for first-degree murder with the Petitioner. He testified, however, that, if the State had advised they would pursue a first-degree murder conviction if the victim died, he would have informed the Petitioner of this possibility and the potential penalty. Counsel said that he also would have explained that a life sentence actually means service of fifty-one years, a fact the public is generally unaware of.

Counsel testified that he had been practicing as an attorney since 1977 and began his career at the Public Defender's office in 1986. Counsel said that the majority of his practice has been criminal representation. Counsel said that during his career he had handled hundreds of first-degree murder cases, many of which were jury trials. Counsel was asked if, in hindsight, he would have done anything differently in Petitioner's case, and he responded that he would have let the grand jury take its course rather than try to expedite the plea to avoid an enhanced sentence. He explained that a slower approach to the process of the case would have allowed for discovery and the filing of motions.

Based upon this testimony the post-conviction court denied post-conviction relief. It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends Counsel failed to provide effective assistance. Specifically, the Petitioner claims that his limited access to Counsel prevented him from making a good decision regarding his case and that Counsel failed to pursue the Petitioner's self-defense argument. The State responds that Counsel's performance was not deficient and that the Petitioner failed to prove he suffered prejudice as a result of Counsel's actions.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). Upon our review, the trial judge's findings of fact are given the effect and weight of a jury verdict, and this Court is "bound by the trial judge's findings of fact unless we conclude that the evidence contained in the record preponderates against the judgment entered in the cause." *Black v. State*, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). Thus, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial court judge, not the appellate courts. *Momon v. State,* 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State,* 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's conclusions of law, however, are subject to a purely de novo review by this Court, with no presumption of correctness. *Fields v. State,* 40 S.W.3d 450, 457 (Tenn. 2001).

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. *House*, 44 S.W.3d at 515 (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)). However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. *House*, 44 S.W.3d at 515.

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

## A. Failure to Pursue Self-Defense Claim

In this case, the Petitioner argues that Counsel failed to pursue the Petitioner's theory of self-defense, instead encouraging the Petitioner to accept the plea. In regard to this issue, the post-conviction court made a finding that the Petitioner agreed with his attorneys that a hurried settlement was a good strategy given that the victim's surgery and possible death were potential risks. The post-conviction court noted that, due to the fact that the Petitioner had essentially no injury and the victim was beaten and injured so severely, Counsel and Co-Counsel had legitimate concerns that a jury would conclude that the defensive force used by the Petitioner was so excessive as to negate self-defense. In summary, the post-conviction court stated, "Therefore, this Court finds that the Petitioner is now merely second guessing the strategy formed by himself and his counsel on facts and circumstances they believed to be true at the time he entered his pleas."

Indeed, the record supports the post-conviction court's findings of fact. Co-counsel interviewed the Petitioner before the preliminary hearing, and based on the interview she pursued a line of questioning related to self-defense. The responses she received, however, did not support a claim of self-defense because the severity of the victim's injuries were not consistent with a claim of self-defense. Counsel also testified that he discussed with the Petitioner a possible self-defense strategy and the challenges of presenting such a claim to a jury, in light of the serious injuries sustained by the victim in this case. Both attorneys testified they did not encourage the Petitioner to accept the plea offer but only conveyed the State's offers to the Petitioner. Thus, we conclude the evidence supports the post-conviction court's findings of fact. *See* T.C.A. § 40-30-110(f). Further, we conclude that Counsel's decision to not pursue a self-defense argument was reasonable because it was based upon the disparity between the victim's and the Defendant's injuries and upon the Defendant's decision to quickly plead guilty in order to avoid more serious charges. *See Burns*, 6 S.W.3d at 462. Thus, we agree with the post-conviction court that the Petitioner failed to demonstrate that he received the ineffective assistance of counsel. He is not entitled to relief as to this issue.

## B. Counsel's Communication with Petitioner

Next, the Petitioner argues that Counsel did not spend enough time with the Petitioner explaining the case. The post-conviction court made no factual findings regarding Counsel's communication with his client; however, our review of the record reveals Counsel testified that he met with the Petitioner two to four times. Co-Counsel testified that she met with the Petitioner twice. Counsel testified that he discussed the case strategy with Petitioner, as well as the challenges of a self-defense argument in this case. Co-Counsel testified that the day of the plea hearing, when the plea offer changed, she told the Petitioner that he did not have to accept the plea if he wanted to further discuss the plea offer with Counsel, but the Petitioner chose to proceed. The transcript of the plea hearing also indicates that the Petitioner stated

that he understood the plea agreement and wanted to enter the plea agreement. The post-conviction court found Counsel and Co-counsel's testimony was consistent and credible and that the Petitioner was "second-guessing" the agreed-upon strategy. We conclude that the Petitioner has not demonstrated by clear and convincing evidence that Counsel's and Co-counsel's representation was ineffective. The Petitioner is not entitled to relief as to this issue.

### III. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the post-conviction court properly denied the Petitioner's petition for post-conviction relief. Accordingly, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE